ROBLIN *et al.*, *Appellants*, v. THE KANSAS CITY, ST. JOSEPH & COUNCIL BLUFFS RAILROAD COMPANY.

Division Two, January 31, 1894.

1. **Railroad**: MASTER AND SERVANT: NEGLIGENCE. The mere fact that a servant is incompetent does not tend to establish a *prima facie* case of negligence on the part of the master in employing him.

2. ———: ———: ———. The burden is on the servant seeking to recover for injuries caused by the negligence of a fellow servant to show the negligence of the master in employing the latter.

3. ———: ———: ———. Where a railroad engineer, acting under the immediate direction of the conductor, backs his train to search for and pick up loose cars and a collision occurs by which the conductor is killed, the company is not liable even if the engineer was incompetent.

*Appeal from Buchanan Circuit Court.*—HON. H. M. RAMEY, Judge.

AFFIRMED.

Action brought against the defendant company, by James Quinn as next friend of Mary and William C. Roblin, minors, to recover damages resulting from the death of their father, alleged to have been caused by the incompetency of F. B. Tracy, the engineer of the train of which Wm. H. Roblin, their father, was the conductor in charge. Such portion of the petition as necessary to quote, is the following:

"That said Wm. H. Roblin, the father of said plaintiffs and the husband of said Celia Roblin, was on the said twenty-seventh day of March, 1888, and long prior thereto, an employee and in the service of the defendant as conductor of a freight train on said road between Kansas City and St. Joseph, and that while the said Wm. H. Roblin was at said time performing the duties required of him as such conductor in and about running a freight train and in the care and management of the same and endeavoring to unite and fasten two parts of said train together, the same having been broken in twain, the defendant by and through the carelessness and negligence of its servants and employees, and by and through the incompetency and unskillfulness of its engineer having charge of the engine moving and running said train, of which incompetency and unskillfulness defendant had due notice,

did wrongfully, carelessly, negligently and unskillfully run a detached part of said train back to and against another part of said train, striking the same with great force and violence and then and there and thereby threw the said Wm. H. Roblin off said train to and upon the ground, and crushed, bruised and mangled him, thereby giving to the said Wm. H. Roblin, divers hurts, concussions, bruises and mortal wounds upon his body and also internal injuries, of which said mortal wounds and injuries the said Wm. H. Roblin on the twenty-seventh day of March, 1888, died.''

The evidence in substance shows that: The train left St. Joseph after night and ran down to Sugar Lake, twenty-four miles south of St. Joseph, where the engine took water. In pulling out from this station the train broke in two, and the engine and twenty-seven cars ran down as far as Bean Lake, the conductor and head brakeman being on this portion of the train. After they had started to pull out of Bean Lake station the conductor discovered that he had lost a portion of his train and signaled the engineer to stop and back up to recover the lost cars. Believing that it was not proper to back in search of the lost cars when he had so many cars attached to his engine, Tracy pulled down to South Iatan, where he wanted to set the cars in on the side track and go in search of the lost cars with the ''light engine.'' This the conductor refused to do, asserting that ''he was in charge of the train and it had better be backed up, that we would delay No. 4,—that is a passenger train that was almost due at Sugar Lake, —said we have to go back quick and get this train.'' Tracy then proceeded to back his engine and the twenty-seven cars north in search of the detached portion of the train. The conductor got on top of the train and went to the forward car in the backward movement, so as to observe the track. The head brakeman was also

on top of the train near the engine. It was then about 4 o'clock in the morning and very dark, and the movement was made by Tracy in obedience to signals given to him by the conductor through the head brakeman, who received and reported the signals given by Conductor Roblin from the front end of the train. The distance from South Iatan to Sugar Lake station is three and one-half miles. In making this backward movement the main portion of the train in the darkness came suddenly upon the detached cars at a point half a mile south of Sugar Lake, and the collision occurred which resulted in Roblin's death. The plaintiffs placed Mr. Tracy upon the stand as their witness, and he testified that at no time during the backward movement did he receive any signal to slow down the speed of his engine, or to stop; and that he did not run fifty feet after the last signal to back up was given him, before colliding with the other part of the train.

Tracy, the engineer, introduced by plaintiffs, testified that he had had over four years of continuous experience as a fireman on the Chicago, Burlington & Quincy Railroad, and three months on the Missouri Pacific Railway; that he had frequently run engines on occasions when his engineer was taken sick on the run. He had made several trips over the defendant's road, prior to the accident, in the capacity of an engineer, and continued in its service for a year and a half after this accident. The evidence further showed that engineers are selected by promoting men who had served three or more years as firemen, and that Mr. Chase, the defendant's master mechanic, at the time he employed him, examined Tracy thoroughly as to his knowledge of an engine, as to the management of a locomotive by an engineer, and as to his general knowledge in respect to signals and time cards in train service.

On the question of the competency of Mr. Tracy, but one of the crew was examined, Jacob Little. He was the rear brakeman on the train, and was with the rear portion that was left at Sugar Lake when the train broke in two. He testified that he went north about a half a mile to Sugar Lake station in order to flag No. 4, a passenger train that was then about due, and from that position saw the lights of the lanterns of the men on top of the cars composing the front portion of the train, as they were returning to pick up the lost cars; that he saw the signals given directing the train to stop; that he could not see the cars; that he did not know the rate of speed at which they came back, and that he was too far away to hear the noise of the collision that occured. Little testified that Tracy did not understand the signals that were given him, and did not obey them, but he further testified that he had never run with Tracy before that trip, and that his opinion was based entirely upon the signals which he saw given by the men on top of the cars just before the collision occurred.

Barada, who came down with the wrecking train to pick up the wreck the next morning, was the only other witness introduced by plaintiff on this point. After the wreck was picked up, such of the cars as could be hauled were fastened together with chains and went on to Kansas City under Barada's charge, who acted as conductor for that trip. Barada's regular duties were those of a brakeman, and this was the first occasion on which he acted as conductor. There were but two cars in the train that had draw bars and links and pins for the purpose of coupling them. The use of the chain produced a great deal of slack. Barada testified that from his observation of Mr. Tracy on that trip to Kansas City, he did not think him a competent engineer "because he did not know ten miles an hour,

from twenty-six." Barada never saw Tracy before that day and never ran with him afterwards.

*H. S. Kelley* for appellant.

(1) The court erred in giving the instruction in the nature of a demurrer to the evidence. Each count of the petition stated good cause of action, and the testimony sustained the petition. The testimony shows that the engineer was unskillful, ignorant and incompetent to handle an engine, and that William Roblin, the conductor, on account of whose death plaintiffs seek to recover, was killed by reason of the incompetency of the engineer, and that the defendant did not exercise ordinary care and prudence to ascertain whether he was qualified to take charge of an engine. The master must use ordinary care in employing suitable and competent servants. *Williams v. Railroad*, 109 Mo. 475; 7 Am. and Eng. Encyclopedia of Law, 831, n.; 832, n.; 845. For neglecting to do so he is liable to his servants for injuries sustained from such neglect. *Harper v. Railroad*, 47 Mo. 567. (2) The degree of care required, or test of ordinary care in such case depends upon the danger to be apprehended from retaining unfit servants in the particular business. *Williams v. Railroad*, 109 Mo. 484; *Bowen v. Railroad*, 95 Mo. 268; *Wilkinson v. Railroad*, 101 Mo. 93; *Gutridge v. Railroad*, 105 Mo. 529; *Tetherow v. Railroad*, 98 Mo. 74; *Railroad v. McDaniels*, 107 U. S. 454; *Railroad. v. Mares*, 125 U. S. 710, 719. It must be such care and caution as would be exercised by an ordinarily prudent and careful man engaged in such work or position. *Tetherow v. Railroad*, 98 Mo. 74. Buswell's Law of Per. Inj., sec. 198. What would be ordinary care depends on the facts surrounding each case. *Frick v. Railroad*, 75 Mo. 542; *Brown*

*v. Railroad*, 50 Mo. 461.   (3)   The case should have
been submitted to the jury under proper instructions.
Negligence is usually a mixed question of law and fact,
and in all doubtful cases the question should go to the
jury.   That is to say, when the facts constituting it
are controverted, or when the facts are not disputed
but there may be a fair difference of opinion as to
whether the inference of negligence should be drawn
or not, or when the facts are in dispute and the infer-
ences to be drawn therefrom are doubtful.   16 Am. and
Eng. Encyclopedia of Law, 463.   (4)   The court erred
in overruling plaintiff's motion to set aside the nonsuit.

*C. A. Mosman* for respondent.

(1) In order to render a master liable to his
servant, who is injured through the incompetency of
another servant, the evidence must establish: *First*.
Some improper act, omission or fault on the part of
such servant, which is the cause of the injury; for it
can make no difference how grossly incompetent the
servant may be, if the injury is not clearly attributable
and traceable to his act.   *Kersey v. Railroad*, 79 Mo.
362.   *Second*. The incompetency of such servant, and
that the improper act, omission or fault was the direct
result of such incompetency; for it can not avail the
injured servant that the act of such other servant, on
the particular occasion, was grossly negligent, or even
reckless, if the servant was perfectly competent to per-
form the duties in which he was engaged and ordinarily
careful in the discharge of them.   A servant assumes
the risk of occasional acts of negligence.   *Gibson case*,
46 Mo. 169; *Lee v. Detroit Bridge*, 62 Mo. 568.   *Third*.
And, also, that the master himself was personally guilty
of negligence, either in employing the incompetent
servant in the first instance, or in retaining such serv-

ant in the service after he was aware that the servant was unfit to perform the duties of the service in which he was engaged.  *Moss v. Railroad*, 49 Mo. 167; *Murphy v. Railroad*, 71 Mo. 202; *Grube v. Railroad*, 98. Mo. 439; *Elliott v. Railroad*, 67 Mo. 272 *loc. cit.* 274; *Huffman v. Railroad*, 78 Mo. 50.  (2) We contend that there was absolutely no proof whatever of any improper act, omission or fault on the part of Tracy.  Little, the only witness testifying on this point, was more than half a mile away at the time of the collision, and, in the darkness, could not know what Tracy's actions at that time were, and hence it was impossible for him to say whether they were negligent or careful.  He could not see the cars, and did not even hear the collision. There is nothing in his evidence that even tends to show that, after the signals seen by him were given, Tracy had the time and opportunity to stop his train and avoid the collision.  His statement that Tracy did not obey the signals is a pure conjecture.

SHERWOOD, J.—The only material question at issue in this case is, whether Tracy was incompetent for the position to which he had been appointed, that of engineer.  His examination on the general topics connected with the duties incident to that kind of employment seems to have been thorough.  He stated to Mr. Chase that his service as fireman on the C., B. & I., in Illinois, was continuous for four years, under a Mr. Colvin, master mechanic, who was acquainted with Mr. Chase, as a railroad man, and Tracy referred the latter to him for information regarding his qualifications.  Whether Chase made inquiries of Colvin touching Tracy's capacity as engineer, does not appear; but, as already seen, it does appear that from three to five years' service as fireman is all that is customarily required of a fireman before he is promoted to the

position of an engineer and given the charge of an engine. And Tracy's testimony shows that frequently, while engaged as fireman, he had run engines for his engineer, when the latter was taken sick.

But, aside from Tracy's testimony, whenever the law imposes a duty on another, it presumes that such duty was properly performed. "Therefore, the mere fact that a fellow-servant is incompetent, * * * does not tend even *prima facie* to establish negligence on the part of the master in employing him, but the burden in all such cases is upon the servant seeking a recovery to establish the fact *that the injury resulted to him because the master did not exercise reasonable and proper care in these respects, or either of them,* and this must be established as a *fact* in the case, and can not result as an inference from the circumstances that the servant * * * was in fact incompetent * * *." Wood's Master and Servant [2 Ed.], sec. 419.

In this case the conductor and engineer were fellow-servants. Beach on Contrib. Neg. [2 Ed.], sec. 334, and cases cited. So that it will be presumed that Chase made all proper inquiries of Colvin before he gave Tracy an engine, and this he had ample opportunity to do, owing to telegraph facilities.

No importance is to be attached to Little's testimony, as he was half a mile from the scene of the collision; the night was dark, and, though he says he saw the signals, yet he could not see the cars; could not tell the rate of speed at which they came back; was too far away to hear the noise of the collision when it occurred; and, besides, he was in the middle of the track, and behind the end of the train that had been left on the track, and he testified he saw no "slow down" signal. In such circumstances he could not tell whether the signals he saw given were obeyed or not, and Tracy says they were obeyed.

Moreover, the conductor, Roblin, was in charge of the train, and the engineer was bound to obey his orders. If this be true, then if Tracy obeyed the orders of his conductor, and he says he did, and this is uncontradicted, and such obedience resulted in Roblin's death, certainly no action would lie against either Tracy or their common master, the defendant company, even conceding that Tracy was in fact incompetent.

For these reasons, and under the authorities cited, the trial court committed no error in holding the demurrer to the evidence of plaintiffs well taken. All concur.